FILED
CLERK, U.S. DISTRICT COURT

5/13/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: ___JB___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

MICHAEL ALAN STOLLERY ("a/k/a MICHAEL STOLLAIRE"),

    Defendant.

CR No. 2:22-cr-00207-JLS

I N F O R M A T I O N

[15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5: Securities Fraud]

The United States of America charges:

[15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5]

A. **INTRODUCTORY ALLEGATIONS**

At times relevant to this Information:

***Relevant Individuals, Entities, Federal Agencies, and Terms***

1. Titanium Blockchain Infrastructure Services, Inc. ("TBIS"), was a California corporation based in Sherman Oaks, California. TBIS offered cryptocurrency investment opportunities to the public and touted these opportunities to the public through social media. TBIS conducted its business principally by means of a website accessible at www.tbis.io. The TBIS website was accessible worldwide to the general public and was accessed by individuals within the Central District of California and elsewhere.

2. EHI, a California corporation, was also based in Sherman Oaks, California, within the Central District of California, and provided technology consultancy services.

3. Defendant MICHAEL ALAN STOLLERY, also known as "Michael Stollaire," was a resident of Sherman Oaks, California, within the Central District of California. Defendant STOLLERY served as the Founder, CEO, President, and sole Director of TBIS, and was the President and sole Director of EHI.

4. The United States Securities and Exchange Commission ("SEC") was an independent agency of the executive branch of the United States government. The SEC was responsible for protecting investors, enforcing federal securities laws, and promulgating rules and regulations in keeping with the same.

5. A "digital asset" or "digital token" generally referred to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets referred to as "cryptocurrencies," "virtual currencies," "digital coins," and "digital tokens."

6. The "blockchain" was a distributed public ledger that recorded incoming and outgoing cryptocurrency transactions.

7. A cryptocurrency white paper generally provided investors and prospective investors with an explanation of a particular cryptocurrency investment offering, including the purpose and technology behind the offering, how the offering was different from other cryptocurrency opportunities, and the prospects for the offering's profitability.

8. Under Title 15, United States Code, Section 77b(a)(1), a "security" included a wide range of investment vehicles, including "investment contracts." Investment contracts were instruments, schemes, or transactions through which a person invested money in a common enterprise and reasonably expected profits or returns derived from the entrepreneurial or managerial efforts of others. Federal law required that an issuer of securities register offers and sales of those securities with the SEC when they offered and sold securities to the public, absent certain specified exemptions.

9. An initial coin offering ("ICO") was a capital raising event in which an entity offered investors a unique "coin" or "token" in exchange for consideration—most commonly in the form of established virtual currencies or fiat currency. These tokens were issued on a blockchain and were oftentimes listed on online platforms, called virtual currency exchanges, where they were tradable for virtual or fiat currencies.

10. To participate in an ICO, investors were typically required to transfer virtual currencies to the issuer's address, online wallet, or other account. During an ICO, or after its completion, the issuer would typically distribute its unique "tokens" to the participants' unique address on the related virtual currency's blockchain. Similar to stockholders in an initial public offering ("IPO"), holders of these tokens were then entitled to certain rights related to a venture underlying the ICO, such as profits, shares of assets, use of certain services provided by the issuer, and voting rights.

11. ICOs and cryptocurrency investment opportunities that qualified as "securities" were required to be registered with the SEC.

### *The Promotion of TBIS' Unregistered Securities Offering*

12. From in or around November 2017 to in or around May 2018, Defendant STOLLERY conducted an ICO of TBIS and introduced TBIS as an investment opportunity to the public through social media and the TBIS Website. Defendant STOLLERY did not register the ICO regarding its cryptocurrency investment offering with the SEC; nor did defendant STOLLERY have a valid exemption from the SEC's registration requirements.

13. On or about August 14, 2017, defendant STOLLERY announced on his personal Twitter feed "I just came up with a new idea for an Initial Coin Offering (ICO). Blockchain developers needed. Stay tuned." From that point, defendant STOLLERY increasingly tweeted about digital assets generally, and embarked on a social media campaign to lure investors to invest in TBIS.

14. Within weeks of announcing that he "just came up with a new idea" for an ICO, defendant STOLLERY mentioned TBIS for the first time. One of these posts, on Facebook, depicted a picture of the TBIS logo and a photo showing the cover of a TBIS "White Paper." A little more than a week after these posts, defendant STOLLERY incorporated TBIS on or about October 10, 2017.

15. On the same day he incorporated TBIS, defendant STOLLERY also created an official TBIS Twitter account, published a link to the official TBIS Telegram channel and asked his followers to join, and posted an announcement on TBIS's Facebook page to a YouTube video titled "TBIS Introduction."

16. Through social media, defendant STOLLERY touted TBIS as a start-up company seeking to develop an IT platform using blockchain technology. On its various social media accounts, TBIS's

profile contained some variation of the following marketing message: "Just as steel changed the building industry forever, Titanium will usher in a new era of network construction, based on blockchain technology." Defendant STOLLERY also posted an official white paper to the TBIS website in order to convince investors to invest in TBIS.

17. Soon after establishing TBIS's social media presence, defendant STOLLERY announced the creation of a new cryptocurrency token or coin. Specifically, on or about October 30, 2017, defendant STOLLERY tweeted "The Titanium BAR Token, now listed on @CryptoCompare —." Defendant STOLLERY also retweeted a post from CryptoCompare (a website devoted to digital assets): "BAR added to Upcoming ICO list." The next day defendant STOLLERY tweeted that the TBIS ICO had been rated and listed on Coin Telegraph (another website that provided news regarding digital assets and blockchain).

18. Defendant STOLLERY also promoted TBIS as an investment and emphasized that holders of BAR would share in TBIS's future earnings and in appreciation in the value of the BAR digital assets. In a transcript of an online interview posted on or about January 11, 2018, defendant STOLLERY even compared investing in TBIS to purchasing Google stock early on at $75 per share: "I've gone outside the subculture of blockchain and people on the street are investing in it like they would buy stocks and, you know, Intel or Google on Wall Street. . . . [L]ike Google I was one of the lucky that was invited to the lottery, and I bought it at $75. . . . And so that's the way I view Titanium."

19. In sum, defendant STOLLERY, primarily through the use of the TBIS website, social media platforms, and news media websites, encouraged and enticed investors to invest in TBIS.

**B.  THE SCHEME TO DEFRAUD TBIS INVESTORS**

20. Beginning at least as early as in or around November 2017, and continuing through at least in or around May 2018, both dates being approximate and inclusive, in the Central District of California, and elsewhere, defendant STOLLERY, knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, in connection with the purchase and sale of BARs, used and employed manipulative and deceptive devices and contrivances, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, by: (1) employing a scheme to defraud; (2) making untrue statements of material fact and omitting material

facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon purchasers of BARs before and during TBIS's ICO. Defendant STOLLERY did so by making and causing to be made materially false and fraudulent statements and material omissions about, among other things, corporate relationships, client testimonials, and the functionality of the BAR, which purportedly affected – through the operation of supply and demand – the value of BARs.

21. The scheme to defraud operated, in substance, as follows:

a. Beginning in late 2017, defendant STOLLERY launched an unregistered offer and sale of BARs via a TBIS ICO, which purportedly was designed to "crowdfund" to raise money to create products and services for the TBIS platform. On or around November 10, 2017, defendant STOLLERY tweeted that the TBIS "pre-sale" to the ICO would be open until December 31, 2017, and directed people to the TBIS website, www.tbis.io. The TBIS ICO officially launched on January 1, 2018, and lasted at least through January 25, 2018.

b. In execution of the fraudulent scheme, defendant STOLLERY solicited investors to purchase BARs from TBIS by making a series of false and misleading statements on the TBIS website, including in versions of the White Paper published on or about December 14, 2017, and on or about January 16, 2018, on the TBIS website, and in defendant STOLLERY'S social media and press statements. Each of these statements, described in more detail below, was material to investors.

**The TBIS White Paper**

c. Defendant STOLLERY was the lead author of the TBIS White Papers and was involved in every revision to the White Papers through at least the January 16, 2018 White Paper. The White Papers included the following statements, each of which defendant STOLLERY then knew were false and misleading:

i. "BAR is a "utility token." BAR, however, did not have any functionality at the time of the ICO.

ii. "As EHI's sister company, [TBIS] will simply inherit EHI's clientele . . . What follows is a short excerpt of some of EHI's customers, which [TBIS] will leverage immediately.

CLIENTS

- Accenture
- APPLE
- Applied Materials
- Boeing
- Cargill
- Citizens Bank
- eBay
- ERCOT
- Exelon
- General Electric
- Hewlett-Packard
- Honeywell
- IBM
- Intel
- Microsoft
- PayPal
- Pfizer
- Santa Barbara Bank and Trust
- Synchrony Financial
- The Bank of Scotland in Ireland
- The Federal Reserve Bank
- The Royal Bank of Scotland
- TrueCar.com
- Universal Studios
- Walt Disney"

***TBIS Website***

d.  Just as he did with the White Papers, on TBIS' Website, defendant STOLLERY also made false and misleading statements about TBIS's ability to leverage EHI's purported customers. Specifically, defendant STOLLERY stated that "As EHI's sister company, [TBIS] will simply inherit EHI's clientele . . . What follows is a short excerpt of some of EHI's customers, which [TBIS] will leverage immediately," and included the logos of various prominent companies, including McDonald's, Pfizer, and Microsoft, which defendant STOLLERY knew at the time was false and misleading.

e.  TBIS' Website also included a hyperlink to EHI's Website for its client list and testimonials. However, defendant STOLLERY knew at the time that the purported client testimonials were false and misleading in several ways, including that (a) for at least two of the companies, the person never gave the testimonial that defendant STOLLERY posted; (b) for at least two of the companies, the person quoted as providing a testimonial never held the position listed in the testimonial; (c) for at least four of the companies, the person quoted as providing a testimonial no longer worked at the company when defendant STOLLERY posted their testimonials; and (d) for at least four of the companies, the company did not authorize the posting of the testimonial.

f.  For example, one of the illegitimate testimonials was from a purported "Director of Network Engineering" for eBay. The testimonial stated that "EHI is all about doing a quality job and delivering the results without delay. It has been a pleasure working with EHI." In reality, the purported source of the testimonial never held or used the title that was attributed to him, and he denied providing the testimonial that was attributed to him. Moreover, eBay did not authorize the use of the testimonial or the company's name or logo on the TBIS website.

g.  Another testimonial was attributed to a purported operations manager named "EHI Gibson" at TrueCar.com. That testimonial stated that EHI "installed and managed a sophisticated set of tools" and that TrueCar was "able to better manage and administer the complex system with the help of EHI's expertise." But there is no record of any individual with the last name of Gibson having worked at TrueCar or its predecessor since September 2015. Moreover, TrueCar would not have approved the use of the testimonial in any event, given the absence of any ongoing business relationship between the company and TBIS, EHI, or defendant STOLLERY.

7

    h. Another example is the purported testimonial from a "service delivery manager" with the Federal Reserve Bank. The testimonial states, in its entirety, "Best enterprise management team I have ever worked with. Talented, conscientious, hard worker, excellent communication skills. The entire package!" The purported author of the testimonial, however, was not an employee of the Federal Reserve Bank, nor authorized to speak on its behalf, but rather was a contractor from May 2010 to September 2012.

    ***Social Media and Press***

    i. Via his personal Instagram account "michaelstollaire," defendant STOLLERY, on January 24, 2018, posted a photo of himself with the caption "Doing the voiceover for an upcoming TV spot about Titanium for LA cable TV and to air on American Airlines monitors starting February 1, 2018!" Relatedly, on January 26, 2018, TBIS's YouTube account posted a video with the title, "TITANIUM: Cable Television Advertisement and Airing on American Airlines Monitors Internationally." Both statements were false and Defendant STOLLERY knew they were false at the time he made them.

    j. In a January 11, 2018 interview on a YouTube channel, "P2P Cryptoz," when asked how TBIS would compete with the "giants" in the industry, defendant STOLLERY stated: "[i]t's the inroad that I previously had with my first company, EHI. These relationships are real. We're in talks with McDonald's, with Walt Disney, with Intel, with Verizon right now. . . . We've got quite a client list." Defendant STOLLERY made this statement, even though he knew then that it was false.

  22. As a result of the fraudulent scheme, from on or about November 17, 2018, through at least January 25, 2018, defendant STOLLERY obtained approximately $21 million in the form of various digital assets, such as Ether and Bitcoin, and cash from dozens of investors located in at least 18 states, including California, and abroad, who purchased BAR.

  23. Defendant STOLLERY did not use all of the invested money as promised but instead comingled some of the ICO investors' funds with his personal funds, using at least a portion of the offering proceeds for expenses unrelated to TBIS, such as credit card payments and the payment of bills for defendant STOLLERY's Hawaii condominium.

C. **EXECUTION OF THE FRAUDULENT SCHEME**

24. On or about January 4 or 5, 2018, within the Central District of California, and elsewhere, for the purpose of executing the above described scheme to defraud, and in furtherance of the manipulative and deceptive devices described above, defendant STOLLERY, directly and indirectly caused the use of an instrumentality of interstate commerce in connection with the purchase and sale of securities, namely, the transfer of approximately $19,999.98 from a Florida-based financial institution to a bank account for TBIS, which defendant STOLLERY controlled and was located in Sherman Oaks, California, for the purchase of approximately 20,000 BARs by an investor located in Florida.

## FORFEITURE ALLEGATION

[18 U.S.C. § 982]

25. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(2), and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction of the offense set forth in this Information.

26. The defendant, if so convicted, shall forfeit to the United States of America the following:

(a) all right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense, including up to $21,000,000; and

(b) to the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), the defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been

placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section
U.S. Department of Justice

/s/ Kevin Lowell
KEVIN LOWELL
TIAN HUANG
Trial Attorneys, Fraud Section
U.S. Department of Justice